IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ELLICOTT CITY CABLE, LLC, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. RDB-15-02506 |
| AXIS INSURANCE COMPANY, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiffs Ellicott City Cable, LLC ("ECC") and Dr. Bruce Taylor ("Dr. Taylor") (collectively, "Plaintiffs") bring this action against Defendant Axis Insurance Company ("Axis" or "Defendant"), seeking a declaratory judgment pursuant to 28 U.S.C. § 2201. Plaintiffs claim that Axis breached its duties to defend and indemnify ECC in an action also before this Court, *DirecTV, LLC v. Taylor, et al.*, Civ. A. No. RDB-15-01760 (the "Underlying Action"). While the present action was pending, the parties in the Underlying Action reached a settlement agreement. *See DirecTV, LLC v. Taylor, et al.*, Civ. A. No. RDB-15-01760, ECF No. 95. This Court accordingly dismissed that action on November 9, 2015. *DirecTV, LLC v. Taylor, et al.*, ECF No. 96.

Presently pending are Plaintiffs' Cross-Motion for Partial Summary Judgment (ECF No. 21) on Defendant's duty to defend and Defendant's Motion to Dismiss (ECF No. 15). The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2016).  For the reasons that follow, Defendant's Motion to Dismiss (ECF No.

1

15) is DENIED;[1] and Plaintiffs' Cross-Motion for Partial Summary Judgment (ECF No. 21) is GRANTED. In sum, Axis had a duty to defend ECC in the Underlying Action.[2]

## BACKGROUND

This Court is presented with dueling motions—the Defendant's Motion to Dismiss (ECF No. 15) and the Plaintiffs' Cross-Motion for Partial Summary Judgment (ECF No. 21). As this Court is granting the Plaintiffs' Motion, this Court will review the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013). This action arises out of successive multimedia liability policies (the "Policies") issued by Defendant Axis to Plaintiffs Dr. Taylor and ECC from May 1, 2009 to May 1, 2013.[3] Mem. in Support of Pls.' Cross-Mot. for Partial Summ. J. at 9. Under the Policies, Axis agreed to defend ECC against any suit seeking damages for a specified media "occurrence . . . during the Policy Period[.]" Compl. Ex. 4 at 2. For purposes of the present action, the parties concede that the relevant terms and conditions of the Policies do not vary. Mem. in Support of Def.'s Mot. to Dismiss, 6, ECF No. 15-1; Mem. in Support of Pls.' Cross-Mot. for Partial Summ. J., 9, ECF No. 21-1.

---

[1] As Plaintiffs' Motion is granted, Defendant's Motion to Dismiss is necessarily denied.

[2] This Memorandum Opinion addresses only Axis's duty to defend ECC in the Underlying Action, as Plaintiffs have not moved for judgment as a matter of law on the duty to indemnify. Neither the duty to indemnify nor the entitlement to attorney's fees has been fully briefed by either party. As such, these issues will be resolved at a later date.

[3] The Policies are: No. MCN 641785 (effective May 1, 2009-May 1, 2010), *see* Compl. Ex. 3, ECF No. 1-4; No. MCN 646531 (effective May 1, 2010-May 1, 2011), Compl. Ex. 3, ECF No. 1-4; No. MCN000109281101 (effective May 1, 2011-May 1, 2012), Compl. Ex. 4, ECF No. 1-5; and No. MCN000109281201 (effective May 1, 2012-May 1, 2013), Compl. Ex. 5, ECF No. 1-6.

In 2005, Dr. Taylor formed Ellicott City Cable, LLC ("ECC") to provide television, internet, and telephone services to residents of the Taylor Village and Waverly Woods communities.[4] ECC contracted to obtain satellite television programming from DirecTV, LLC ("DirecTV")[5] through DirecTV agents Sky Cable, LLC ("Sky Cable") and North American Cable Equipment ("NACE"). Compl. Ex. 8, 43, ECF No. 1-9 (Taylor Decl. ¶ 6). Under the contracts, ECC distributed the DirecTV programming through equipment and credentials provided by Sky Cable and NACE. *Id.* ECC, in turn, made monthly payments to DirecTV for access to its programming. Underlying Action Amended Compl. ¶ 81. According to Dr. Taylor, this arrangement continued until 2014, when ECC terminated its relationship with DirecTV. Taylor Decl. ¶¶ 23-24. ECC never contracted with DirecTV to provide internet or telephone services. Taylor Aff. ¶¶ 8-9.

On December 6, 2013, DirecTV filed the Underlying Action against, *inter alia*, ECC, Dr. Taylor, and Sky Cable, in the United States District Court for the Western District of Virginia. *See* Underlying Action Amended Complaint. The Underlying Action was subsequently transferred to this Court. *See* Compl. Ex. 7, ECF No. 1-8; *DirecTV, LLC v. Taylor, et al.*, Civ. A. No. RDB-15-01760. DirecTV alleged that the Underlying Action Defendants "fraudulently obtain[ed], and assist[ed] others in obtaining DIRECTV's satellite television programming and distribut[ed] that programming over unauthorized cable

---

[4] Dr. Taylor, among others, developed the Taylor Village and Waverly Woods communities in Ellicott City, Maryland. Taylor Aff. ¶¶ 2, 4, ECF No. 21-2.

[5] DirecTV is "the nation's leading Direct Broadcast Satellite system, delivering hundreds of channels of digital entertainment and informational programming to more than 20 million homes and businesses equipped with specialized DIRECTV receiving equipment." Compl. Ex. 1, ECF No. 1-2 (Underlying Action Amended Complaint ¶ 13).

television systems." Underlying Action Amended Compl. ¶ 1. Specifically, DirecTV alleged that ECC, through Sky Cable, set up private cable systems to deliver DirecTV Satellite Master Antenna Television ("SMATV") to more units in Taylor Village and Waverly Gardens than set forth in the contracts. *Id.* ¶¶ 58, 63, 72. ECC was also alleged to have created multiple dwelling unit ("MDU")[6] accounts with DirecTV for both properties, but distributed the programming to occupants and residents outside of the scope of the agreements. *Id.* ¶¶ 60, 64. In so doing, ECC allegedly used wiring to traverse public rights of way. *Id.* ¶ 75.

DirecTV asserted six claims against ECC and Dr. Taylor. In Count I, DirecTV alleged that the Underlying Action Defendants violated 47 U.S.C. § 605(a)[7] by (a) "creating and assisting in creating DIRECTV MDU and SMATV accounts with false information and for improper purposes[;]" (2) "installing and maintaining DIRECTV receiving equipment at locations or facilities not authorized by DIRECTV[;]" (3) "re-broadcasting and retransmitting DIRECTV programming to unauthorized locations[;]" and (4) "distributing and selling DIRECTV programming in a manner contrary to DIRECTV policy and federal law[.]" *Id.* ¶ 89. Count II, asserting a violation of 18 U.S.C. § 2511(1)(a),[8] levied similar allegations to those of Count I. *Id.* ¶ 94. In Count III, DirecTV alleged that ECC and Dr. Taylor (Sky Cable and its managing member, Robert Saylor) committed fraud by falsely representing material information upon which DirecTV relied "in authorizing the SMATV

---

[6] MDU agreements provide DirecTV programming to multiple unit commercial properties (*e.g.*, apartment buildings). Underlying Action Amended Compl. ¶ 19.
[7] 47 U.S.C. § 605(a) broadly prohibits the unauthorized publication or use of communications.
[8] 18 U.S.C. § 2511(1)(a) prohibits the intentional interception and disclosure of wire, oral, or electronic communications.

and MDU accounts," activating the equipment, and supplying its television programming. *Id.* ¶¶ 100-103. ECC and Dr. Taylor were allegedly unjustly enriched by their purported wrongful conduct (Count IV). *Id.* ¶¶ 107-109. Finally, DirecTV asserts that ECC and Dr. Taylor conspired with Sky Cable and Robert Saylor to defraud DirecTV in this manner, in violation of the common law and Virginia Code §§ 18.2-499, 18.2-500 (Counts V & VI). *Id.* ¶¶ 111-17. DirecTV sought, *inter alia*, compensatory damages for any injuries suffered.

ECC notified Axis of the Underlying Action on May 28, 2015, requesting coverage under the applicable Policy. Compl. Ex. 6, ECF No. 1-7. On July 9, 2015, AXIS denied coverage on the grounds that the Underlying Action arose from ECC's alleged intentional unauthorized use of DirecTV's programming. Compl. Ex. 7, 2-3, ECF No. 1-8. ECC responded to dispute this conclusion, offering documentation to rebut the allegations of unauthorized access, intentional or otherwise. Compl. Ex. 8, 1-8, ECF No. 1-9.

After Axis refused to change its original determination, ECC and Dr. Taylor filed the subject action in this Court. *See generally* Compl. Plaintiffs seek a declaratory judgment on the related issues of Axis's duties to defend and indemnify the Plaintiffs in the Underlying Action. *Id.* ¶ 1. During the pendency of this action, DirecTV and the Plaintiffs reached a settlement agreement in the Underlying Action. Mem. in Support of Pls.'s Mot. for Partial Summ. J. at 16. Axis did not participate in the settlement. *Id.* This Court dismissed the Underlying Action on November 9, 2015. *DirecTV, LLC v. Taylor, et al.*, Civ. A. No. RDB-15-01760, ECF No. 96.  ECC and Dr. Taylor seek Partial Summary Judgment on the duty to defend of Axis, which contends that this action should be dismissed in its entirety.  Axis

contends that ECC's alleged intentional unauthorized use of data precludes a duty to defend and is within the exclusions of the liability policies issued.

## STANDARD OF REVIEW

The resolution of the pending Motions requires this Court to confront only legal, and not factual, issues. As such, this Court will examine the parties' respective arguments for or against coverage through the lens of Rule 56 of the Federal Rules of Civil Procedure, and not Rule 12(b)(6).

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).

If both parties have filed motions for summary judgment, then this Court "must consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Bacon v. City of Richmond*, 475 F.3d 633, 637-38 (4th Cir. 2007) (internal quotation marks omitted). Similarly, this separate analysis must apply to the competing Motion for Partial Summary Judgment and the Motion to Dismiss this case. Regardless, this Court "must not weigh evidence or make credibility determinations." *Foster v. University of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage). However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249-50.

## ANALYSIS

As noted *supra*, Axis refused to defend ECC in the Underlying Action due to ECC's alleged intentional unauthorized use of DirecTV's programming. In Maryland, the duty of an insurer to defend the insured is "determined by the allegations in the tort actions." *Brohawn v. Transamerica Ins. Co.*, 347 A.2d 842, 850 (Md. 1975). If the underlying claims are clearly covered by the insurance policy, then the insurer is obligated to defend the insured. *Id.* Yet, under the "potentiality rule," the insurer has a duty to defend the insured "[e]ven if the

7

[underlying] plaintiff does not allege facts which clearly bring the claim within or without the policy coverage." *Id.* (internal citations omitted). The "potentiality rule" thus broadens the insurer's duty to defend beyond the scope of the duty to indemnify. *Id.* As a result, the allegations in the underlying complaint may trigger the duty to defend where it is unclear whether the insurer is ultimately obligated to indemnify the insured. *Id.*; *see also St. Paul Fire & Mar. Ins. v. Pryseki*, 438 A.2d 282, 285 (Md. 1981). Where the duty to defend is contested, an insurer may not look outside the underlying pleadings to deny its obligations. *Aetna Cas. & Sur. Co. v. Cochran*, 651 A.2d 859, 863 (Md. 1995). An insured, however, may use extrinsic evidence to establish the potentiality of coverage. *Id.* at 866; *see also Walk v. Hartford Cas. Ins. Co.*, 852 A.2d 98, 110 (Md. 2004) ("[p]otentiality of coverage may be shown through the use of extrinsic evidence so long as the insured shows that there is a reasonable potential that the issue triggering coverage will be generated at trial.").

The Policies at issue in the present action provide coverage to ECC for certain forms of media liability.[9] *See* Compl. Ex. 3 at 2-3. Specifically, under Section I.A ("Media Liability – Payment for Damages"), Axis agreed to

> pay on behalf of the Insured all Damages in excess of the Self-Insured Retention and within the applicable Policy Limit as a result of an Occurrence in connection with Scheduled Media during the Policy Period that gives rise to a Claim, regardless of when a Claim is made or suit is brought . . .[10]

---

[9] As noted *supra*, the Policies employ nearly identical language for all provisions relevant to the pending Motions.

[10] With respect to Section I.A., an "occurrence" is defined as

> the actual or alleged . . . publication, broadcast or other dissemination of Matter; acts committed in the process of researching, investigating, gathering, acquiring, obtaining, preparing, compiling or producing Matter;

8

*Id.* at 2. This coverage is subject to several exclusions, including, in relevant part, claims "for or arising out of any actual or alleged . . . unauthorized access to, unauthorized use of, or unauthorized alteration of any computer or system, hardware, software, program, network, data, database, communication network or service, including the introduction of malicious code or virus by any person . . ." *Id.* at 7 (Section IV.A.14).

Beyond the coverage of Section I.A., all Policies included the additional coverage of Endorsement No. 3 for claims "for or arising out of the failure to prevent a party from unauthorized access to, unauthorized use of, tampering with or introduction of a computer virus or malicious code into data or systems."[11] *Id.* at 15. This additional coverage, however, does not include alleged or actual claims of

> intentional unauthorized access to, unauthorized use of, tampering with or introduction of a computer virus or malicious code into data or systems by any Insured or person who would qualify as an Insured but for their acts being outside the scope of their duties as a partner, . . . except that this exclusion shall not apply to any Insured who did not commit, acquiesce or participate in the actions that gave rise to the Claim.

*Id.* This amended exclusion applies only to the coverage provided by Endorsement No. 3.

---

> or the licensing, syndication, serialization, distribution, sale or lease of Matter . . . by or with permission of the Insured.

*Id.* at 5 (Section II.O.1.).

"Matter," as used in the Policies, is "communicative or informational content regardless of the nature or form of such content, including content disseminated electronically and/or digitally when authorized or controlled by the Insured . . ." *Id.* (Section II.M.).

Finally, "Scheduled Media" is "all 'Matter' broadcast by [ECC]" and all "'Matter' disseminated via www.eccable.com[.]" *Id.* at 1.

[11] This Court notes that the language of the "unauthorized access" coverage of Endorsement No. 3 varies from Policy to Policy. Mem. in Support of Pls.' Cross-Mot. for Partial Summ. J. at 11 n.7. The parties agree, however, that the scope of the coverage and associated exclusions do not differ in any material way.

In moving for partial summary judgment, Plaintiffs argue that Axis owed ECC a duty to defend under Maryland law on two grounds. First, Plaintiffs contend that neither exclusion cited by Axis applies to the allegations of the Underlying Action because DirecTV's television programming is not "data." Even if the programming at issue is "data," Plaintiffs alternatively argue that DirecTV levies claims separate and independent from any allegations of unauthorized use. The presence of these independent claims obliges Axis to defend ECC under Maryland law. Each argument will be addressed in turn.

### A. "Data" Under the Unauthorized Access Provisions

Axis relies on two exclusions to deny ECC coverage under the Policies. *See* Section IV.A.14; Endorsement No. 3. Both exclusions excuse Axis's contractual duty to defend for claims for or arising out of unauthorized access to, in relevant part, "data." *Id.* The exclusion of Endorsement No. 3 adds a qualifier to the unauthorized access provision, requiring that the access be "intentional." Endorsement No. 3. Axis contends that the Underlying Action Amended Complaint alleges just that—intentional unauthorized access by ECC to DirecTV's television programming. Plaintiffs argue in response that, as DirecTV's programming is not "data" within the meaning of either exclusion, neither applies.

When an insurer relies upon a policy exclusion to deny coverage, the insurer bears the burden of proving that the exclusion applies. *Finci v. Am. Cas. Co.*, 593 A.2d 1069, 1087 (Md. 1991); *Warfield-Dorsey Co. v. Travelers Cas. & Sur. Co. of Illinois*, 66 F. Supp. 2d 681, 689 (D. Md. 1999). Under Maryland law, insurance contracts are interpreted like other contracts. *Cheney v. Bell Nat'l Life Ins. Co.*, 556 A.2d 1135, 1138 (Md. 1989). As such, "if no ambiguity in

the terms of the insurance contract exist[s], a court has no alternative but to enforce those terms. *Dutta v. State Farm Ins. Co.*, 769 A.2d 948, 957 (Md. 2001) (citing *Kendall v. Nationwide Ins. Co.*, 702 A.2d 767, 773 (Md. 1997)). If the policy language is ambiguous, however, then the language "will be construed liberally in favor of the insured and against the insurer *as drafter of the instrument*." *Dutta*, 769 A.2d at 957 (quoting *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 699 A.2d 482, 494 (Md. Ct. Spec. App. 1997) (emphasis in original)).

In this case, the term "data" is ambiguous within the meaning of the unauthorized access exclusions. As a preliminary matter, DirecTV did not use "data" to describe the television programming that it alleged ECC and Dr. Taylor accessed without authorization. Moreover, the Policies do not define "data." This term, however, is broadly defined by the *Merriam-Webster Dictionary* as "facts or information used usually to calculate, analyze, or plan something" or "information that is produced or stored by a computer." *Data*, Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/data (last visited Jul. 14, 2016). Given the breadth of this definition, the principles of *ejusdem generis* and *noscitur a sociis* counsel consideration of "the accompanying words so that . . . general and specific words, capable of analogous meaning, when associated together, take color from each other[.]" *LeRoy v. Kirk*, 277 A.2d 611, 614 (Md. 1971) (citing Black's Law Dictionary (4th Ed.)).

The first unauthorized access exclusion, Section IV.A.14, applies to such access of "any computer or system, hardware, software, program, network, data, database, communication network or service, including the introduction of malicious code or virus by any person . . ." Compl. Ex. 3 at 7. The common factor underlying all terms listed is their

11

relation to the internet or digital matters in general. Indeed, the inclusion of "introduction of malicious code or virus" speaks directly to a common risk associated with the internet (and computers). "Data," in this context, thus appears to concern information related to the internet, and not television programming.

Axis notes that DirecTV's programming, in its digital form, is "digitize[d] and compresse[d] . . . into a signal that is then encrypted" and sent to DirecTV receivers via satellite signal. Underlying Action Amended Compl. ¶ 15. Even under the qualified interpretation of "data" set forth *supra*, Axis argues that the alleged unauthorized access is thus "data." Yet, this argument ignores that DirecTV's television programming takes both digital *and* analog forms. Under Axis's reasoning, ECC would receive insurance coverage for unauthorized access to *analog* television programming, and not digital television programming. Neither Axis nor the Policies themselves present any persuasive argument in favor of such a distinction. Indeed, as drafter of the Policies, the ambiguity of the term "data" must be construed against Axis.

Similarly, the exclusion of Endorsement No. 3 applies to intentional unauthorized access of "data or systems[.]" *Id.* at 15. While this exclusion does not include all terms of the first exclusion, it employs the same broad term accompanied by terms like "computer virus" and "malicious code." *Id.* Even if the exclusion uses the disjunctive "or" in describing the excluded conduct, this use does not negate the inference that "data or systems" concern information related to the internet or computers generally.

This broad term and its accompanying words stand in contrast to the language elsewhere in the Policies that more clearly encompasses television programming. For example, the Policies expressly provide coverage for claims "for or arising out of . . . any form of infringement of copyright, violation of Droit Moral, passing-off, plagiarism, Piracy or misappropriation of ideas under implied contract[.]" *Id.* at 2 (Section I.A.4). "Piracy," as defined by the Policies, is "the wrongful use, reprinting or reproduction of copyrighted intellectual property." *Id.* at 5 (Section II.Q). Unauthorized use is necessarily wrongful, thus "piracy" describes precisely the present allegations—the unauthorized (or "wrongful") use of DirecTV's copyrighted intellectual property, *i.e.*, its television programming. Moreover, contract interpretation fundamentally favors internal consistency. *See Dumbarton Improvement Assoc., Inc. v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232-33 (Md. 2013) (explaining that "the contract must be construed in its entirety and . . . effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part") (internal citation omitted). To interpret "data" as including DirecTV's television programming would effectively broaden the scope of the exclusion to eliminate any coverage for piracy. Rather than create such a contradiction, this Court will construe the ambiguity of "data" against Axis as drafter of the Policies.[12] DirecTV's television programming is thus not "data" within the meaning of either exclusion.

---

[12] Axis alternatively argues that ECC conceded that the DirecTV television programming is "data" within the meaning of either policy when seeking coverage for the Underlying Action. This argument is unpersuasive. ECC's communications concerning the unauthorized access exclusions arose only when Axis denied coverage. ECC was thus forced to argue within the framework dictated by the grounds on which Axis denied coverage. Nonetheless, ECC never represented that the television programming was "data."

**B.  Presence of Independent Claims**

More importantly, even if either exclusion applied to ECC's allegedly unauthorized access to DirecTV's television programming, the Underlying Action was not premised on those allegations alone. In Maryland, an insurer is obligated to defend, "notwithstanding alternative allegations outside the policy's coverage, until such time, if ever that the claims have been limited to ones outside the policy coverage." *S. Maryland Agric. Ass'n v. Bituminous Cas. Corp.*, 539 F. Supp. 1295, 1299 (D. Md. 1982) (quoting *Steyer v. Westvaco Corp.*, 450 F. Supp. 384, 389 (D. Md. 1978)); *accord Utica Mut. Ins. Co. v. Miller*, 746 A.2d 935, 940 (Md. Ct. Spec. App. 2000). If, however, the remaining allegations "arise" out of the excluded allegations, the insurer has no duty to defend. *Cato Inst., Inc. v. Continental Cas. Co.*, Civ. A. No. JFM-11-1418, 2011 WL 3626784, at *4 (D. Md. Aug. 16, 2011). In other words, an excluded allegation that is "essential to establishing the insured's liability" is inseparable from the remaining allegations when, due to its exclusion, "no liability arises for which the insurer is responsible." *N. Assurance Co. of America v. EDP Floors, Inc.*, 533 A.2d 682, 687 (Md. 1987).

Axis contends that every allegation in the Underlying Action is inseparable from ECC's allegedly unauthorized access to the television programming. Although that action's Amended Complaint is certainly well-supplied with allegations of ECC's alleged unauthorized access, it also details several other grounds on which DirecTV sought relief. For example, DirecTV alleged that ECC (and Dr. Taylor) violated DirecTV policy by charging Multiple Dwelling Unit ("MDU") residents a separate fee for "base analog DIRECTV programming . . . [that] must be considered an amenity of the MDU[.]"

Underlying Action Amended Compl. ¶ 21. This violation of DirecTV policy is entirely separate from the allegations of unauthorized use, as it concerns the manner in which ECC allegedly billed its residents for DirecTV services. Count I specifically asserts that ECC (and Dr. Taylor) violated 47 U.S.C. § 605(a) by, *inter alia*, "re-broadcasting and retransmitting DIRECTV programming to unauthorized locations," but also by "selling DIRECTV programming in a manner contrary to DIRECTV policy and federal law[.]" *Id.* ¶ 89. ECC's alleged billing scheme thus falls precisely within the allegations of Count I.  Additionally, DirecTV alleged that EEC "interfer[ed] with DIRECTV's contractual and regulatory obligations and with prospective business relations;" "distribute[d] its programming using wiring that crosse[d] over or under a public right of way, in violation of federal regulations;" and "violated [EEC's] agreement[] with DIRECTV, which provide[d] that the MDU base package must be considered an amenity of the MDU." *Id.* at ¶¶ 60, 61, 67.

Moreover, DirecTV's fraud claim (Count III) does not rest solely on ECC's alleged misrepresentation regarding the number of television programming recipients. Rather, DirecTV alleged that "[EEC] falsely represented to DIRECTV that they were (a) creating an authorized subscriber accounts for the purpose of receiving DIRECTV satellite television programming at valid service addresses with a stated number of viewers; (b) supplying accurate and truthful information about the location of DIRECTV satellite receiving equipment; (c) supplying accurate and truthful information about the intended use of DIRECTV satellite television programming, including, but not limited to, the number of viewers of DIRECTV programming provided for by the account; and (d) agreeing to abide

by all terms and conditions in the DIRECTV SMATV and MDU Agreements, including the prohibition on reselling, retransmitting and re-broadcasting any DIRECTV television programming." *Id.* ¶ 100. DirecTV relied upon these allegedly false representations when authorizing ECC's DirecTV accounts. *Id.* ¶ 102. Once again, these allegations are distinct and independent from the unauthorized access allegations. The fraud exclusion of the Policies only applies after "a jury or court finds [the acts] to be fraudulent . . . [.]" Compl. Ex. 3 at 7 (Section IV.A.8). Axis was thus obligated to defend ECC in the Underlying Action due to the presence of allegations that do not "arise out of" the excluded allegations.[13]

## CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss (ECF No. 15) is DENIED; and Plaintiffs' Cross-Motion for Partial Summary Judgment (ECF No. 21) is GRANTED. In sum, Axis had a duty to defend ECC in the Underlying Action.

A separate Order follows.

Dated: July 22, 2016                                /s/
                                                                                     Richard D. Bennett
                                                                                     United States District Judge

---

[13] As discussed *supra*, this Memorandum Opinion addresses only Axis's duty to defend ECC in the Underlying Action, as Plaintiffs have not moved for judgment as a matter of law on the duty to indemnify. Neither the duty to indemnify nor the entitlement to attorney's fees has been fully briefed by either party. As such, these issues will be resolved at a later date.